Henry A. Platt (SBN: 142304)
henry.platt@saul.com
**SAUL EWING ARNSTEIN & LEHR LLP**
1919 Pennsylvania Avenue, NW, Suite 550
Washington, D.C. 20006-3434
Tel: (202) 342-3447
Fax: (202) 337-6065

Joshua W.B. Richards, *admitted pro hac vice*
Joshua.richards@saul.com
Amy L. Piccola, *admitted pro hac vice*
amy.piccola@saul.com
**SAUL EWING ARNSTEIN & LEHR LLP**
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102-2186
Tel: (215) 972-7777
Fax: (215) 972-7725

*Limited appearance on behalf of Defendants California Lutheran University, Chris Kimball, Melissa Maxwell-Doherty, Jim McHugh, and Karin Grennan*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DEBBY DAY; DE ANN YOUNG; JASON GLUCKMAN; JANE DOES 1-24,

Plaintiffs,

v.

CALIFORNIA LUTHERAN UNIVERSITY; CHRIS KIMBALL; MELISSA MAXWELL-DOHERTY; JIM MCHUGH; KARIN GRENNAN and ROES 1 through 200, inclusive,

Defendants.

CASE NO. 8:21-cv-1286

**DEFENDANTS CALIFORNIA LUTHERAN UNIVERSITY, CHRIS KIMBALL, MELISSA MAXWELL-DOHERTY, JIM MCHUGH, AND KARIN GRENNAN'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Date of Motion Hearing:
July 8, 2022 at 10:30 a.m.
The Hon. Josephine L. Staton

# TABLE OF CONTENTS


**TABLE OF AUTHORITIES** .......... iii

**INTRODUCTION** .......... 1

**ARGUMENT** .......... 3

**I. This action must be dismissed as to defendants CLU, Kimball, Maxwell-Doherty, and McHugh under Rule 4 because service was neither proper nor timely.** .......... 3

A. Service was improper. .......... 3

B. Service was untimely. .......... 6

**II. The Softball Players' Defamation Claims (Count 2 – Slander And Count 3 – Libel) Fail Based On The Common Interest Privilege And Failure To Plead The Required Elements To State A Claim.** .......... 10

**III. Plaintiffs fail to state a claim for breach of contract.** .......... 13

**IV. Plaintiffs do not sufficiently plead "outrageous conduct" or severe emotional suffering, so their IIED claim should be dismissed.** .......... 15

**V. Plaintiffs' negligence claims should be dismissed because they fail to sufficiently allege a cognizable duty or breach.** .......... 16

**VI. Coach Day does not sufficiently plead a retaliation claim against CLU, Kimball, Grennan, and McHugh.** .......... 17

**VII. Plaintiffs fail to state a claim for hostile work environment.** .......... 18

**VIII. Plaintiffs fail to state a claim for constructive termination because they fail to allege protected class status or any causal link.** .......... 19

**IX. Coach Day's PAGA claim fails because she failed to provide sufficient notice as to the employees on whose behalf the claim is asserted.** .......... 20

**X. Plaintiffs did not sufficiently plead a claim under California's Unfair Competition Law because, among other reasons, they have not pleaded economic injury.** .......... 21

**XI. Counts 1-7 and 13 are barred by the "ANTI-SLAPP" statute.** .......... 22

**XII. Plaintiffs' demand for punitive damages is not adequately pleaded and should be stricken because, among other reasons, Plaintiffs have failed to allege facts that demonstrate malice.................................. 23**

**CONCLUSION .......................................................................................... 24**

# TABLE OF AUTHORITIES

## CASES

*Aydelotte v. Town of Skykomish*,
757 F. App'x 582 (9th Cir. 2018) .......... 8

*Branch Banking and Trust Co. v. DMSI, LLC*,
871 F.3d 751 (9th Cir. 2017) .......... 9

*Broam v. Bogan*,
320 F.3d 1023 (9th Cir. 2003) .......... 13

*Brockmeyer v. May*,
383 F.3d 798 (9th Cir. 2004) .......... 3, 6

*Brown v. USA Taekwondo*,
483 P.3d 159 (Cal. 2021) .......... 17

*Buendia v. Boulet,*
No. 819-cv-01442-JLS-DFM, 2021 WL 3417639 (C.D. Cal. June 1, 2021) .......... 8

*Dauven v. George Fox Univ.*,
CV 09-305-PK, 2010 WL 6089077 (D. Or. Dec. 3, 2010) .......... 14

*Elias v. Spotify USA Inc.*
No. CV 20-1854-JFW (ASx), 2020 WL 11626649 (C.D. Cal. Dec. 16, 2020) .......... 21

*Flores v. City of Los Angeles*,
No. 2:21-cv-07918-ODW, 2022 WL 1103738 (C.D. Cal. April 13, 2022) .......... 7

*Gonzalez v. Millard Mall Servs., Inc.*,
No. 09CV2076-AJB WVG, 2012 WL 3629056 (S.D. Cal. Aug. 21, 2012) .......... 20

*Guerrero v. Baca*,
154 F. App'x 601 (9th Cir. 2005) .......... 10

*Haley v. Cohen & Steers Cap. Mgmt., Inc.*,
871 F. Supp. 2d 944 (N.D. Cal. 2012) .......... 15

*Hawran v. Hixson*,
147 Cal. Rptr. 3d 88, 115 (Cal. App. 2012) .................... 10

*In re Solara Med. Supplies, LLC Customer Data Sec. Breach Litig.*,
No. 3:19-CV-2284-H-KSC, 2020 WL 2214152 (S.D. Cal. May 7, 2020) ........ 14

*Kashmiri v. Regents of Univ. of California*,
67 Cal. Rptr. 3d 635, 646-48 (Cal. App. 2007) .................... 13, 14

*Khan v. Dunn-Edwards Corp.*,
19 Cal. App. 5th 804 (2018) .................... 20

*Kwikset Corp. v. Superior Ct.*,
51 Cal. 4th 310, 246 P.3d 877 (2011) .................... 21

*Lee v. Eden Med. Ctr.*,
690 F. Supp. 2d 1011 (N.D. Cal. 2010) .................... 18

*Park v. Bd. of Trustees of California State Univ.*,
393 P.3d 905 (Cal. 2017) .................... 22

*Poozhikala v. Medtronic Inc.*,
No. CV 21-8889 PA (SKX), 2022 WL 610276 (C.D. Cal. Jan. 31, 2022) .23, 24

*Regents of Univ. of California v. Superior Ct.*,
4 Cal. 5th 607, 413 P.3d 656 (2018) .................... 16, 17

*S.A. v. Tulare Cty. Off. of Educ.*,
No. CV F-08-1215 LJO GSA, 2009 WL 3296653 (E.D. Cal. Oct. 6, 2009) ..... 23

*Sanchez v. Am. Media, Inc.*,
No. CV 20-2924-DMG, 2020 WL 8816343 (C.D. Cal. Dec. 29, 2020) ........... 22

*Summers v. McClanahan*
44 Cal. Rptr. 3d 338 (Cal. App. 2006) .................... 5, 6

*Townsel v. Contra Costa Cty., Cal.*,
820 F.2d 319 (9th Cir. 1987) .................... 9

*United Med. Devices, LLC v. Blue Rock Cap., Ltd.*,
No. CV16-1255 PSG (SSX), 2016 WL 9047123 (C.D. Cal. Aug. 5, 2016) .... 3, 4

*U.S. v. Ritchie*,
342 F.3d 903 (9th Cir. 2003) .......... 1, 2

*Walter v. W. Indus.*,
No. SACV131503JLSANX, 2013 WL 12137687
(C.D. Cal. Dec. 10, 2013) .......... 17

*Wei v. State of Hawaii*,
763 F.2d 370 (9th Cir. 1985) .......... 8, 9, 10

*York v. Starbucks Corp.*,
No. CV 08-07919 GAF .......... 20

## STATUTES

20 U.S.C. § 1232(a)(4)(A) .......... 23

Cal. Bus. & Prof. Code § 17200 .......... 21

Cal. Civ. Proc. Code § 425.16(e)(4) .......... 22

Cal. Lab. Code § 1102.5 .......... 18

Cal. Gov't Code § 12940(h) .......... 17, 18

## OTHER AUTHORITIES

34 C.F.R. § 99.3 .......... 23

Fed. R. Civ. P. Rule 4 .......... *passim*

Fed. R. Civ. P. Rule 12 .......... 13, 24

Defendants California Lutheran University (the "University"), Chris Kimball, Melissa Maxwell-Doherty, Jim McHugh, and Karin Grennan (collectively, the "Defendants"), by and through their undersigned counsel, submit this Reply Memorandum of Law in Further Support of their Motion to Dismiss Plaintiffs' First Amended Complaint. (Dkt. 58.)

## INTRODUCTION

Plaintiffs' Opposition to Defendants' Motion to Dismiss (Dkt. 88 ("Opp.")) attempts to frame a narrative that Plaintiffs, after participating in an event perceived by many as racist, are merely victims of some "protracted campaign" by Defendants to cause unspecified harm for an unspecified reason. However, Plaintiffs' own factual allegations do not fit within, or support, such a depiction.

Instead, Plaintiffs admit that during a team bonding activity, Softball Team members colored their faces darkly, and that, whatever their intention, "when looked at in a photograph [the dark facial make-up] came across as blackface," (FAC ¶ 82), which was "perceived as racially insensitive," *id.,* and that their actions came "from a place of ignorance." *Id.* While Plaintiffs maintain that the dark coloring on the lip-syncing Softball Players was intended to mimic the facial hair of Black individuals, everyone involved agrees that White students dressed up as the all-Black cast of *Fresh Prince of Bel-Air*, wore dark facial make-up and Afro wigs, and performed a lip-syncing routine pretending to be the all-Black cast:[1]



[1] *See* Declaration of Henry A. Platt, Esq. submitted herewith. Plaintiffs reference the lip-syncing event video throughout their Amended Complaint, including a reference to the videos Plaintiffs posted to their Instagram page. (FAC ¶ 72.) The Court may therefore consider the images of the lip-syncing event "as part of the complaint." *U.S.*

Plaintiffs then publicly posted depictions of their performance as Black individuals with dark facial make-up to their Softball Team Instagram page. (*Id*. at ¶ 72.) According to Plaintiffs, a member of the CLU community, *prior* to any emails or messaging from anyone at CLU, viewed the pictures and videos and contacted a CLU administrator to express concern over the racist nature of the team event. (*Id*. at ¶ 73.) To underscore this point: *it is undisputed that prior to any actions by the University, a member of the community viewed the images posted by Plaintiffs and concluded they were racially charged.* (*Id.*) Upon receipt of such concerns, and against the backdrop of CLU's heightened awareness of racism and racist conduct (*see* FAC ¶¶ 31, 33, 35-36) – including an additional, unrelated racially concerning incident on campus – the University took affirmative steps to state its views to its community with respect to acts of racism.

In conjunction with two emails to the CLU community emphasizing such intolerance to racism (without providing any details or referencing any individual by either name or affiliation), the University invited the community to participate in a "dialogue at a campus forum on race and equity" and hosted a private meeting and facilitated a counseling session for the Softball Players and their families. (*Id*. at ¶¶ 86, 89; Dkt. 58, Ex. A to Platt Decl. at 2-3; Dkt. 58, Ex. B to Platt Decl. at 2-3.) One might fairly ask: if a university cannot convene an issue to educate around an act of racial insensitivity – intentional or not – what can it do in response to an incident of this nature? It is undisputed that there were no individual student conduct processes related to the racially-charged team event. (FAC at ¶ 92.)

Plaintiffs allege that their peers did not perceive their conduct well and "shunned" them. (Opp. at 18.) Plaintiffs' Opposition attempts to frame such shunning, and other "not nice" conduct, by Plaintiffs' peers as the "direct result of [Defendants'] defamatory, false, and/or misleading statements," (*id*.); however, none

---

*v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

of the factual allegations support such a misguided conclusion. Instead, it is evident that *Plaintiffs' own actions* of applying dark facial make-up to perform as an all-Black cast of a sitcom caused the alleged actions taken against them by those in the CLU community. (*Id.* at ¶ 72, 78.) The University responded to its community's concerns of racism on campus by condemning any actions of racism and providing a forum for students to discuss racism on campus. While Plaintiffs are eager to shift blame from their own actions to CLU and its administrators, none of the factual allegations (or the underlying events) amount to any legal liability on behalf of CLU or the individual Defendants.

## ARGUMENT

### I. This action must be dismissed as to defendants CLU, Kimball, Maxwell-Doherty, and McHugh under Rule 4 because service was neither proper nor timely.

#### A. Service was improper.

"Once service is challenged, Plaintiffs bear the burden of establishing that service was valid under Rule 4." *Brockmeyer v. May*, 383 F.3d 798, 801 (9th Cir. 2004). Plaintiffs' Opposition does not satisfy this burden. It is undisputed that Plaintiffs' *only* attempt to serve Defendants with the original Complaint and summonses occurred on October 29, 2021, when process server Rezac handed summonses for all Defendants to Norma Meza, an executive assistant at CLU. (Meza Decl. (Dkt. 58-13) at ¶ 9.) The parties agree that Ms. Meza was *not* the agent authorized to accept service on behalf of CLU, but instead the assistant to the University's publicly designated agent of service. (*Id.* at ¶¶ 5-8.) The remaining defendants have been sued in their individual capacities. Nothing in Plaintiffs' Opposition meets their burden to show that service on Ms. Meza constitutes valid service on the individual Defendants.

In determining whether a plaintiff has met its burden under Rule 4, courts are permitted to "weigh and determine disputed issues of fact." *United Med. Devices,*

*LLC v. Blue Rock Cap., Ltd.*, No. CV16-1255 PSG (SSX), 2016 WL 9047123, at *1 (C.D. Cal. Aug. 5, 2016). Here, a disputed fact remains as to the encounter between Ms. Meza and Mr. Rezac on October 29, 2021.

The University has presented evidence that Ms. Meza informed Mr. Rezac that Karen Davis (CLU's registered agent at the time) was unavailable and asked Mr. Rezac if he could come back on Monday (the next business day) so that Ms. Davis could accept the documents. (*See* Meza Decl. (Dkt. 58-13) at ¶ 9.) Mr. Rezac replied "no" and informed Ms. Meza that he could not come back on Monday and the documents ***needed to be served that day***. (*Id.* at ¶ 10.) Mr. Rezac, on the other hand, represented that when he asked Ms. Meza if she was authorized to accept service on behalf of all Defendants, she "responded in the affirmative," and she informed him that she would make sure she got the papers to the proper people. (*See* Rezac Decl. (Dkt. 68-5) at ¶ 6.)

The Court can draw reasonable inferences from the circumstances to determine that the credibility of Mr. Rezac's declaration is called into serious doubt. The facts, undisputed by all parties, are as follows:

- Plaintiffs' deadline for service was October 27, 2021;
- Plaintiffs failed to meet this deadline;
- On October 29, 2021, this Court entered an order to show cause as to why this case should not be dismissed under Rule 4(m), (Dkt. 20); and
- Upon receipt of the order to show cause, Plaintiffs' attorney, Ms. Levine, realized she failed to make timely service and contacted her firm's attorney service and instructed them to serve Defendants.

Understandably, Ms. Levine was in a rush to effectuate service. A reasonable inference can be drawn that Ms. Levine, under pressure to avoid having her case dismissed, stressed the importance to the process server of serving the parties *that very day*. Waiting any longer would only further prejudice Plaintiffs, as Ms. Levine and the process server were certainly aware in light of their years of experience.

While Plaintiffs repeatedly state that Mr. Rezac's company stood to make more money had he known Ms. Meza was not authorized to accept service, that argument dodges the real point: that it was in Mr. Rezac's long term financial interest to get the complaint served *fast* if he wanted future work from Ms. Levine. Plaintiffs further fail completely to address how a process server with 40 years of experience could reasonably believe that an executive assistant (and not to any of the named individual Defendants) could be an agent authorized to accept service on behalf of any of the individual Defendants.

Plaintiffs argue Ms. Meza had an alleged "close relationship" with CLU's agent for service of process, and Defendants eventually received the documents constituting "actual notice," but the case they cite concludes exactly the *opposite*. In *Summers v. McClanahan*, the court held that service was *improper* where the plaintiff served the defendant's personal manager who had never been authorized by the defendant to accept service. 44 Cal. Rptr. 3d 338, 346-47 (Cal. App. 2006). Just as here, the plaintiff in *Summers* relied on the fact that the defendant received *actual notice* of the suit through the delivery to her personal manager. The court, however, did not agree that actual notice somehow rendered service proper, stating as follows:

> [Plaintiff's] rationale would appear to be if service of process, even if totally outside the statutory prescriptions, has somehow resulted in actual notice to the defendant in time to defend the action, then any defects in the manner of service should be overlooked . . . no California appellate opinion has adopted this rationale and, we think, for good reason. Adopting [Plaintiff's] rationale would constitute a judicial repeal of California's statutory law governing service of process . . . Clearly this is not what the Supreme Court had in mind when it held the revised service of process law should be liberally construed. One benefit of the liberal construction rule is its tendency to eliminate unnecessary, time-consuming, and costly disputes over service of process issues. An "actual notice" rule would do just the opposite. It would create a

> standardless free-for-all in which defendants would bring motions to quash service claiming they never received actual notice and, in many cases, plaintiffs would be unable to prove otherwise.

*Id*. at 415. Accordingly, "actual notice" on Defendants does nothing to render service proper. Just as in *Summers*, this Court should find that service here was improper.

### B. Service was untimely.

Even if this Court were to find that service was proper (which it was not), it would not save Plaintiffs' suit from dismissal because it was outside of the required 90-day period and Plaintiffs have failed to meet their burden to show good cause and excusable neglect.[2] Unless Plaintiffs show good cause *and* excusable neglect, dismissal is non-discretionary. (*See generally* Defendants' Motion to Dismiss (Dkt. 58-1) at 28) (reciting standards under Rule 4(m).) It is noteworthy that Plaintiffs' Opposition fails to even attempt to argue that they demonstrated "excusable neglect" for their failure to seek an enlargement of time to serve the Complaint before the expiration of the allotted 90 days – Plaintiffs attempt only to address "good cause." In any event, neither are present in this case.

Defendants are sympathetic that one of Plaintiffs' attorneys', Mr. Saltz, was going through a difficult personal time after the filing of this lawsuit. While that time was undoubtedly difficult for Mr. Saltz, Mr. Saltz was not the only lawyer representing Plaintiffs in this case. Ms. Levine, who appeared in this action on behalf of Plaintiffs on July 30, 2021, is an equally capable attorney who (according to her own Declaration) is as an experienced litigator, practicing for nearly twenty years. (Levine Decl. (Dkt. 68-1) at ¶ 2.) Ms. Levine asks this Court to accept that, while her partner was largely unavailable, she was unable to effectuate timely service pursuant

[2] The Court has not yet ruled on the order to show cause as to why this case should not be dismissed under Rule 4(m), and unless Plaintiffs establish excusable neglect, service is *presumptively* invalid. *Brockmeyer*, 383 F.3d at 801.

to her obligations to this Court and her client for no reason that is articulated in the Opposition or her Declaration. This is insufficient.

In a very similar case, this Court recently found that a plaintiff "fail[ed] to show good cause" for failure to timely serve under Rule 4(m), notwithstanding a death in the family of one attorney, where the attorney "had co-counsel throughout this process who was aware of the status of the case and who could have followed up with the new process server or assisted with the filing of status documents." *Flores v. City of Los Angeles*, No. 2:21-cv-07918-ODW, 2022 WL 1103738, at *5 (C.D. Cal. April 13, 2022). As in *Flores*, good cause for failure to timely serve the summonses and complaint has not been established in this case.

Plaintiffs' response – blaming Defendants for not reaching out to offer to accept service, for instance – is specious. Counsel accepts no responsibility for their inexcusable neglect to timely serve. Plaintiffs cite Rule 4(d) for the proposition that Defendants "duty to avoid unnecessary expenses of serving the summons" somehow shifts the burden of timely service onto Defendants to essentially make sure counsel follows rules *imposed on Plaintiffs*. It is obvious, however, that Rule 4(d) does not shift the burden of service to Defendants to ask counsel how they can assist in Plaintiffs' service responsibility. Instead, Rule 4(d) provides that Defendants must avoid unnecessary expenses of serving the summons *when the plaintiff requests that the defendant waive service of a summons.* Rule 4(d) does nothing to save Plaintiffs here; their counsel never contacted known counsel for Defendants to request a waiver of service during the 90-day period. Plaintiffs' counsel, fully aware of Mr. Saltz's situation, never once called known counsel for Defendants to ask if they could work together to get the parties served or request that Defendants waive service of a summons. In any event, no one from the Saltz firm contacted known counsel for CLU (with whom they had mediated) to request a waiver of service during that time.[3] Had

---

[3] Mr. Saltz also states that prior to his leave, his office had incorrect addresses for the individual Defendants (Saltz Decl. (Dkt. 28) at ¶ 3), however, Plaintiffs do not

Plaintiffs reached out with the extenuating circumstances prior to the expiration of the 90-day period, this would be a different case.

Instead, Ms. Levine acknowledges that she was under the mistaken impression that her colleague (who she admittedly knew was on leave) had made arrangements for service. She only realized her error when this Court issued an order to show cause on October 29, 2021, and she then, for the first time, rushed to attempt late service on Defendants.[4] (Levine Decl. at ¶¶ 7-8.) Counsel's mistake is not "good cause" to avoid dismissal. *See Wei v. State of Hawaii*, 763 F.2d 370, 372 (9th Cir. 1985) ("[Rule 4(m)] is intended to force parties and their attorneys to be diligent in prosecuting their causes of action," and if attorneys' mistakes were to constitute good cause then "the good cause exception would swallow the rule"). Likewise, *Buendia v. Boulet* has no application here because plaintiff made several attempts to serve defendant prior to the 90-day period and other defendants were timely served and engaged in discovery in that time. No. 819-cv-01442-JLS-DFM, 2021 WL 3417639, at *2 (C.D. Cal. June 1, 2021). That is simply not the situation here.

In addition to failure to show "good cause," Ms. Levine's mistaken impression that Mr. Saltz had made arrangements for service, and her failure to file a motion asking for an enlargement of time to serve the Complaint at *any time* prior to the expiration of the 90-day period, does not amount to "excusable neglect," as Plaintiffs

---

explain their failure to serve <u>*CLU*</u> at that time, as CLU's address and its Registered Agent is publicly available online, or the efforts undertaken to obtain address information of other defendants. *See, e.g.*, *Aydelotte v. Town of Skykomish*, 757 F. App'x 582, 586 (9th Cir. 2018) (finding no "excusable neglect" for failure to serve remaining defendants, even where plaintiff showed one defendant threatened to kill plaintiff's lawyer).

[4] Notably, while Ms. Levine asserts that *she* contacted the firm's attorney service (Levine Decl. at ¶ 8), Mr. Saltz's also claims that when he returned to work in late October, *he* instructed the attorney service to serve Defendants. The inconsistencies further underscore the likely rushed messaging conveyed to Mr. Rezac. (Dkt. 28 at ¶ 4.)

appear to concede. To that end, Mr. Saltz explains that he "returned to work three weeks into October" (Dkt. 28 at ¶ 4), which was of course before the expiration of the 90-day period. *See, e.g.*, *Branch Banking and Trust Co. v. DMSI, LLC*, 871 F.3d 751, 765 (9th Cir. 2017) (finding no excusable neglect where the "reason for the delay" in seeking an extension of time has "not been addressed at all"). Plaintiffs fail to proffer any reason, let alone a reason that shows excusable neglect, for their failure to seek an enlargement of time.

Finally, Plaintiffs argue that the statute of limitations issue weighs in favor of ignoring their failure to comply with Rule 4(m).[5] The Ninth Circuit has disagreed time and again. In *Townsel v. Contra Costa Cty., Cal.*, the Ninth Circuit affirmed the dismissal of an action where the plaintiff failed to attempt service within the required 90 days, despite the plaintiff's argument that dismissal of his complaint was an abuse of discretion "because the statute of limitations had run and the dismissal for untimely service was therefore effectively with prejudice." 820 F.2d 319, 320-21 (9th Cir. 1987). Rejecting the plaintiff's argument, the Court referenced Rule 4(m)'s requirement as a valuable tool in encouraging "***diligent prosecution of lawsuits***." *Id.* (emphasis added); *accord* Initial Standing Order (Dkt. 17) at 2 ("Although Fed. R. Civ. P. 4(m) allows 90 days for service of the summons and complaint, the Court *expects* service to be effectuated more promptly.") (emphasis added). It is difficult to imagine a more apt case than this for that admonition. In *Wei v. State of Hawaii*, the Ninth Circuit affirmed a dismissal with the effect of time-barring a claim because the plaintiff did not attempt to serve the defendants within the required time period, nor could he show that he was prevented from effectuating service within that period by factors beyond his control. 763 F.2d 370, 371-72 (9th Cir. 1985); *see also Guerrero v. Baca*, 154 F. App'x 601 (9th Cir. 2005) ("we cannot conclude that the district court

---

[5] Plaintiffs concede that "the statute of limitations of certain claims expired two weeks after the filing of the original complaint." (Opp. at 7.)

abused its discretion even though the effect of the dismissal [pursuant to Rule 4(m)] was to bar [plaintiff's] claim.").

Plaintiffs find no support in the facts and no support in the law for their failure to timely or properly serve the Complaint, and the appropriate remedy is dismissal.

## II. The Softball Players' Defamation Claims (Count 2 – Slander And Count 3 – Libel) Fail Based On The Common Interest Privilege And Failure To Plead The Required Elements To State A Claim.[6]

First, while Plaintiffs once again repeat their argument that the common interest privilege does not apply whenever a statement is given to the media (Opp. at 18-19), this is simply untrue, as explained in Defendants' Motion to Dismiss. The case Plaintiffs cite for this misguided principle, *Hawran v. Hixson*, held that the privilege did not apply where the defendant maliciously held a press release for the world at large, specifically "designed for [] media outlets to pick up and repeat," after purposefully disseminating the press release a wire service distribution vehicle. 147 Cal. Rptr. 3d 88, 115, 123 n.8 (Cal. App. 2012). *Hawran* does not establish a rule that the privilege is automatically lost if a statement makes its way to the media, as Plaintiffs suggest. The court merely held that in that particular (and distinguishable) instance, the privilege did not apply.

Second, Plaintiffs argument that the University acted with actual malice, such that the common interest defense does not apply, is simply not supported by their factual allegations. Plaintiffs' Opposition states that the "FAC expressly alleges that the subject statements were knowingly and/or recklessly false." (Opp. at 19.) To support this contention, Plaintiffs' mis-cite to FAC ¶ 80, claiming that "Defendant Kimball confirmed he had previously viewed the pictures and videos" and that he "saw Softball Players wearing male beard stubble – not 'Blackface.'" (Opp. at 16.)

---

[6] Where are arguments made by Plaintiffs are not specifically addressed in this Reply, Defendants incorporate by reference the arguments made in their motion; such points are not conceded here.

According to Plaintiffs, CLU "knew at the time they published said email" that none of the Softball Players engaged in Blackface. (*Id.*) However, this is not supported by the cited paragraph. To the contrary, FAC ¶ 80 reads that "Defendant Kimball and/or other CLU officials" spoke to newspapers "about the so-called 'Blackface' incident." (FAC ¶ 80.) While Plaintiffs did allege that Kimball allegedly stated that he "believes in his heart that the Team did not intend to do anything racist," this does not, as Plaintiffs argue, evidence his (or CLU's) *lack of belief in the truth* of February 5 Email, February 10 Email, or statements made at the February 8 Meeting (none of which references intent at all). (*Id.* at ¶ 173.) As Kimball himself clarified, "there is a distinction between intent and impact and that some of the images play to things that are hurtful." (*Id.* at ¶ 87.) That Kimball allegedly did not believe the Softball Players *intended* to be racist, or *intended* any dark make-up on their face to be perceived as racist, does not mean he did not believe that the conduct was racist, or at least perceived as such. None of the allegations in Plaintiffs' Amended Complaint amount to sufficiently pleading actual malice. Merely stating that they were made with "malice" (with no supporting facts) is not enough to survive a motion to dismiss.

In an attempt to save their defamation claims, Plaintiffs make a single conclusory statement that Defendants actions "were designed to harass and inflict significant harm on Plaintiffs" and Defendants had "no legitimate need to reference any specific racist incident . . . in order to communicate that CLU does not condone racism." (*Id.* at ¶ 76.) However, Plaintiffs provide *no factual allegations* to suggest that Defendants acted with an intent to harass and inflict significant harm to Plaintiffs, nor does their narrative support such an intention. To the contrary, Plaintiffs affirmatively acknowledge the heightened awareness of racism and racist conduct during the 2019-2020 academic year at CLU, and that CLU had a legitimate need to address such campus-wide interest in combatting racism. (*Id.* at ¶¶ 31, 33, 35-36.) As part of this legitimate purpose to combat racism, CLU addressed the racially charged

lip-syncing event, along with other racial incidences on campus. None of Plaintiffs' factual allegations provide otherwise or show any intent to harass or harm Plaintiffs.

Finally, Plaintiffs' defamation claims fail as a matter of law because the February 5 and February 10 emails were not "of and concerning" the Softball Players. Plaintiffs attempt to point to the following as evidence that the emails were "of and concerning" the Softball Players: (1) a single CLU student posted to social media that he was upset that "CLU softball team participated in black face, and a white girl on the women's water polo team decided it's okay for her to say the N word," (*id.* at ¶ 78); and (2) Plaintiffs' scheduled games in Texas were cancelled and, instead, they were required to meet with administrators to discuss the event. (*Id.* at ¶¶ 85, 87.)

First, as admitted by Plaintiffs, the February 5 and 10 emails did <u>not</u> name any of the Plaintiffs, or refer in any way to the Softball Team. Second, Plaintiffs *themselves* posted pictures of the lip-syncing event to their Instagram page. (*Id.* at ¶ 66.) Thereafter, a peer student posted that Plaintiffs' racially-charged actions, depicted on Plaintiffs' own publicly available social media page, upset him. (*Id.* at ¶ 78.) This fact does nothing to support Plaintiffs' argument that the CLU community read the emails, and knew it referred to the Softball Players. In fact, if the Softball Players' Instagram page was as "infrequently visited" with a low view count, as Plaintiffs suggest, (*id.* at ¶ 99), it does not logically follow that the campus community would read CLU's emails and think "this is the incident with the Softball Players." To the contrary, if Plaintiffs' Instagram was so "infrequently visited," and CLU's emails did not refer to the Softball Players, how would it follow that the community that read the emails would gather that they were "of and concerning" Plaintiffs? Plaintiffs own allegations belie this conclusion.

Third, Plaintiffs cannot now *for the first time* allege that Defendants' actions related to the Texas games were "public," because such allegations were *not* alleged in the Amended Complaint. *See Broam v. Bogan*, 320 F.3d 1023, 1026 (9th Cir. 2003) ("In determining the propriety of a Rule 12(b)(6) dismissal, a court may not look

beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss.").[7] As such, this does nothing to advance Plaintiffs' argument that the emails were "of and concerning" Plaintiffs.

## III. Plaintiffs fail to state a claim for breach of contract.

Plaintiffs' breach of contract claim is based on Defendants allegedly "engaging in harassing behavior" and "letting others violate the Handbook" where the Handbook provides that CLU does not tolerate harassment and hate crimes. (FAC ¶ 147.) While the Handbook does state that CLU does not tolerate such behavior, nothing about a general statement condoning a general societal wrong amounts to a specific promise by CLU. Nor does this language signal an intention that the document be read as an enforceable contract between CLU and its students.

While Plaintiffs cite to *Kashmiri v. Regents of Univ. of California*, this case actually supports Defendants' position. 67 Cal. Rptr. 3d 635, 646-48 (Cal. App. 2007). *Kashmiri* dealt with a fee dispute where the defendant university raised the professional educational fees for continuing students after promising on its website and in its catalogues that such fees would not be raised for the duration of the students' enrollment. *Id.* at 638. The court found that this "*specific* promise," which did *not* "involve[] academic and disciplinary decisions," was contractual in nature. *Id.* at 647-48 (emphasis in original). Importantly, *Kashmiri* makes a clear distinction between specific promises (such as those for fees, or promises for specific equipment, computer training, or qualified instructors), which are contractual in nature, versus

---

[7] While Plaintiffs' Opposition alleges that "Defendants *publicly* canceled Plaintiffs' Texas road trip," "*publicly* placed all of the Softball Coaches on administrative leave" and "forced [Plaintiffs] to attend a meeting on campus inside the *public* sports complex for all of the CLU fairly *small Student body to see* that Plaintiffs were in meetings at CLU instead of in Texas" (Opp. at 15-16) (emphasis added), no such public aspect of these actions is referenced anywhere in Plaintiffs' Amended Complaint. (*See* FAC ¶¶ 85-87, stating that "*the Softball Team* was informed" of the cancelled Texas trip and "*the coaches* were informed that they were being put on administrative leave.") (emphasis added).)

general promises or expectations, which are not. *Id*. It is clear that the ***general*** statements that are at issue in this case are ***not*** the specific promises that courts find contractually enforceable.[8]

In addition, while Plaintiffs cite to *Dauven v. George Fox Univ.*, the student handbook there included an *express statement* indicating that the relationship was contractual and included an "Agreement Contract" requiring students to read, sign, and abide by the guidelines contained there. No. CV.09-305-PK, 2010 WL 6089077, at *17 (D. Or. Dec. 3, 2010). Plaintiffs' assertion that "[t]he same is alleged here," (Opp. at 23), is a misstatement of the CLU Handbook. While the CLU Handbook includes a statement that "*Students* accept the following policies and agree to be bound" (FAC ¶ 140) (emphasis added), there is no statement in the CLU Handbook that it is intended to bind *the University* as in *Dauven*, nor is there an "Agreement Contract" requiring CLU students' signatures.

Furthermore, Plaintiffs do not even address Defendants' arguments regarding their failure to sufficiently allege any breach. Instead, they summarily write that "it is also alleged that CLU breached" alleged promises by allowing students to harass Plaintiffs and veiled threats affecting safety. (Opp. at 25.) Defendants refer back to their arguments in Section III(B) of their Motion to Dismiss which provides ample support for Plaintiffs' failure to state a breach of contract claim.

---

[8] While Plaintiffs attempt to distract the Court with an exceedingly long footnote rattling off other provisions in the handbook, Opp. at 25 n.4, none of those provisions are in play in this case and are therefore irrelevant to their breach of contract claim. Here, the question is whether the University breached an alleged contractual obligation regarding harassment and hate crimes; any other provisions are not relevant. Courts look to the specific provision allegedly breached for breach of contract claims. *See In re Solara Med. Supplies, LLC Customer Data Sec. Breach Litig.*, No. 3:19-CV-2284-H-KSC, 2020 WL 2214152, at *5 (S.D. Cal. May 7, 2020).

**IV. Plaintiffs do not sufficiently plead "outrageous conduct" or severe emotional suffering, so their IIED claim should be dismissed.**

Plaintiffs attempt to argue that the following allegations amount to conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community":

- Requiring the members of the Softball Program to attend a meeting featuring a guest speaker on racial inclusion. (FAC¶ 124.) This meeting was attended by others in the CLU community, although only the Softball Team had seating set up for them. (*Id*. at ¶ 125.)
- Providing the Softball Team players other meetings to discuss the racially charged incident (which one Softball player described as an offer for "poems, trees and rocks"), which Plaintiffs declined to attend, and did not attend. (*Id*. at ¶¶ 91, 126.)
- Missing six away-games over the course of one week to discuss the racially charged team event. (*Id*. at ¶¶ 85-88.)
- Attending a "counseling session" with Defendant Doherty. (*Id*. at ¶ 89.)

It is difficult to understand how *any* of the above-mentioned conduct, or any other alleged conduct, could reasonably be considered "outrageous" conduct that sufficiently states a claim in the eyes of the law. It is inconceivable that an average member of the community would read the allegations and exclaim: "Outrageous!" *See Haley v. Cohen & Steers Cap. Mgmt., Inc.*, 871 F. Supp. 2d 944, 960 (N.D. Cal. 2012). Defendants' response to the lip-syncing event, even accepting Plaintiffs' allegations as true, falls far short of the "high bar" required to state a claim. *See id.*

Furthermore, Plaintiffs only make a *collective* claim of "mental distress," without stating which Plaintiffs allegedly suffered which harm. Plaintiffs' Opposition does nothing to advance their IIED claim, but instead, repeats that "the Softball Team" suffered distress. The "Softball Team" is not a party-Plaintiff, and Plaintiffs

cannot cobble together claims for all themselves by borrowing one element from one Plaintiff and the other from another Plaintiff. Without identifying which players suffered which harms, Plaintiffs' claim also fails.

**V. Plaintiffs' negligence claims should be dismissed because they fail to sufficiently allege a cognizable duty or breach.**

Plaintiffs extensive and exclusive reliance on *Regents of Univ. of California v. Superior Ct.*, 4 Cal. 5th 607, 413 P.3d 656 (2018), is misplaced. Plaintiffs overgeneralize and mischaracterize the holding as follows: "the California Supreme Court found that the relationship between universities and students is a special one that gives rise to tort liability if the University fails to protect the students from harm." (Opp. at 28.) This is, however, not what *Regents* held at all. Instead, *Regents* makes abundantly clear that the special relationship between universities and their students applies to "foreseeable acts of ***violence*** in the classroom or during curricular activities." *Regents*, 413 P.3d at 669 (emphasis added).[9] Moreover, *Regents* goes to lengths to highlight that the duty was found in that particular case where a violent action occurred that caused physical injury, and such a duty does not apply in every situation of an alleged failure to protect students from "harm" as Plaintiffs contend. *Id*. at 664.

While in *Regents* a student was stabbed in class with a kitchen knife by a fellow student and the physically injured student "was taken to the hospital with life-threatening injuries," *id*. at 662, Plaintiffs here allege that after they dressed up and sang as Black actors, they received "threats of violence" from their peers which were never acted upon. (FAC ¶¶ 103.) When referencing their alleged damages resulting

---

[9] Of note, the "special relationship" in *Regents* only applies to violent attacks that occurred in the classroom or during curricular activities, and does not apply to off-campus or social activities. *Id*. at 668, 672. In addition to *Regents* not applying in this context, Plaintiffs have not even alleged where any of the alleged "threats" occurred or in what context (i.e. if they were off-campus, in social activities, or during class).

from Defendants' alleged negligence, Plaintiffs write that the Softball Team suffered "severe emotional distress and physical manifestations of that emotional distress." (*Id.* ¶¶ 223, 230.) Glaringly absent from the Amended Complaint is any allegation that Plaintiffs experienced any type of physical violence. To rule here that the special relationship found in *Regents* applies to this case would dramatically expand California state law.

Indeed, in determining whether there is a "special relationship," "[a] court considers whether the parties have a special relationship by considering the ***particular facts and circumstances*** of their association with one another." *Brown v. USA Taekwondo*, 483 P.3d 159, 170 (Cal. 2021). Critically, one of those factors – "the degree of *certainty* that a plaintiff suffered injury" – "may come into play when the plaintiff's claim involves intangible harm, such as emotional distress. Here, however, we are addressing claims of physical injuries that are capable of identification." *Regents*, 413 P.3d at 670-74 (emphasis in original).

Finally, while Plaintiffs accurately quote *Walter v. W. Indus.*, it too is limited to torts resulting in physical injury: "Where a plaintiff ***can demonstrate a physical injury caused by the defendant's negligence,*** anxiety specifically due to a reasonable fear of a future harm attributable to the injury may also constitute a proper element of damages," No. SACV131503JLSANX, 2013 WL 12137687, at *2 (C.D. Cal. Dec. 10, 2013) (emphasis added). Here, however, Plaintiffs do not allege any physical injury at all, further underscoring the insufficiency of their negligence claims.

## VI. Coach Day does not sufficiently plead a retaliation claim against CLU, Kimball, Grennan, and McHugh.

First, Plaintiffs strangely claim that Defendants' Motion to Dismiss has "an avoidance of a citation to Government Code § 12940(h)." (Opp. at 31.) This is patently false, as Defendants cite directly to the statute four times and cite to the

FEHA case law six times throughout their two and a half page "retaliation" section in their Motion to Dismiss. (Dkt. 58 at 31-33.)

Second, Plaintiffs do not contest Defendants' argument that Coach Day's report of alleged NCAA violations cannot form a basis for retaliation claims under California Labor Code § 1102.5 or Government Code § 12940(h), thus conceding there is no legal basis for retaliation based on reporting alleged NCAA violations.

Third, Plaintiffs' Opposition does not change the fact that Plaintiffs' do not allege a causal nexus between Coach Day's report under Title IX and CLU's response to the racially-charged lip-syncing event. While Plaintiffs repeat their argument that there was temporal proximity between the alleged report to Kuntz and the alleged adverse actions, regardless of any temporal proximity, a causal link still requires a showing that the defendant knew of the protected activity. *Lee v. Eden Med. Ctr.*, 690 F. Supp. 2d 1011, 1025 (N.D. Cal. 2010). Plaintiffs do not sufficiently allege the named Defendants knew of the report to Kuntz.

Finally, while Plaintiffs allege that Defendants made statements to the media "concerning Coach Day in order to publicly malign her and cause her embarrassment," ( Opp. at 33), Plaintiffs do not (nor can they) allege that any alleged news media statements ever mentioned or concerned Coach Day, let alone were made for any purpose to cause her embarrassment or "publicly malign her."

## VII. Plaintiffs fail to state a claim for hostile work environment.

Put simply, the Amended Complaint does not allege any harassment *based on a protected class*, as required to state a claim. Instead, Plaintiffs base their claim on "unwelcome [conduct] that was directed towards Coach Day, Young, and Gluckman ***based on their status as employees, and specifically as coaches of the CLU Softball Player.***" (FAC ¶ 264) (emphasis added).)

In an attempt to shift focus from this simple fact, Plaintiffs write that Coach Young is African-American and that she was discriminated against based on a "false

racial event." (Opp. at 34.) However, according to Plaintiffs' Amended Complaint, when Defendants "put Coach Young on administrative leave to 'investigate' said fabricated 'Blackface' incident to further perpetuate their false narrative, CLU did not know that Coach Young is African-American[.]" (FAC ¶ 274) (emphasis added).) It is not plausible – or even possible – that Defendants could have engaged in harassment based on Coach Young's race if they did not even know she was African-American. Plaintiffs do not even attempt to allege that Coach Day or Coach Gluckman belong to a protected class that formed the basis of their claims.

And the fact that the lip-syncing event was racially charged is inapposite to the Softball Coaches' hostile work environment claim. Plaintiffs do not (nor can they) allege that any of the "hostile actions" were the *result of the Softball Coaches' protected class*. Instead, they affirmatively allege that the "unwelcome conduct" was directed to the Softball Coaches "based on their status as employees." (*Id.*) As a result, Plaintiffs' claim fails.

## VIII. Plaintiffs fail to state a claim for constructive termination because they fail to allege protected class status or any causal link.

While Plaintiffs' Opposition rattles off allegations of alleged adverse actions, none of this helps their claim because they still do not allege that (1) Coach Gluckman is a member of any statutorily-defined protected class; and (2) that any action about which Coach Young complains had a causal link to her status as an African-American. Importantly, as emphasized above, Coach Young admits that while she is African-American, "CLU did not know" her race when "the Constructive Termination Defendants" took the actions about which she complains. (FAC ¶ 274.)[10] Coach Gluckman and Coach Young's constructive termination claim fails for this reason and those articulated in Defendants' Motion to Dismiss.

---

[10] It is disingenuous for Plaintiffs to argue that "Defendants finally admit that Plaintiffs have alleged that Plaintiff Young is African-American – though they conveniently ignored this allegation for purposes of attacking the Hostile Work

**IX. Coach Day's PAGA claim fails because she failed to provide sufficient notice as to the employees on whose behalf the claim is asserted.**

To state a claim under PAGA, a plaintiff is required to comply with the provision of notice to the Labor and Workforce Development Agency ("the LWDA") that specifies: (1) the alleged violations; <u>*and*</u> (2) on whose behalf the aggrieved employee seeks to bring the PAGA claim. *Khan v. Dunn-Edwards Corp.*, 19 Cal. App. 5th 804, 808 (2018). Plaintiffs' Opposition inaccurately asserts that *Khan* stands for the proposition that plaintiffs satisfy the pre-filing procedures for PAGA by simply providing a notice that vaguely refers to "employees," without providing any additional identifying detail to permit the employer to identify those allegedly aggrieved. (Opp. at 38.) Such a proposition is <u>not</u> supported by *Khan*, and plaintiffs again ask this Court to expand the scope of state law beyond what the law says or what other courts have ruled.

Plaintiffs mistakenly argue that *Khan* relied on a prior case where notice of simply "two aggrieved employees" was found to be sufficient. But the case cited by *Khan*, *Gonzalez v. Millard Mall Servs., Inc.*, actually found notice sufficient because the plaintiff *identified the other employee expressly by name*. No. 09CV2076-AJB WVG, 2012 WL 3629056, at *3 (S.D. Cal. Aug. 21, 2012) (reciting notice to LWDA that the law office "represent[s] Guadalupe Gonzalez and Normal Lopez Juan, former employees of Millard Mall Services, Inc. and The Mallard Group ("Defendants") in a potential class action . . .").[11] Plaintiff Day did not do that here.

---

Environment cause of action." (Opp. at 36.) As discussed, Coach Young *admits* that CLU *did not know* of her race when it took any of the actions related to Plaintiffs' claims. Defendants did not "conveniently ignore" this allegation, Defendants could not logically take an adverse action based on someone's race if they were unaware of said race.

[11] *York v. Starbucks Corp.*, No. CV 08-07919 GAF PJWX, 2012 WL 10890355, at *4 (C.D. Cal. Nov. 1, 2012), did not deal with a question of insufficiency of the LWDA notice to detail the identity of aggrieved employees, but with the specificity

Plaintiffs accurately state that *Elias v. Spotify USA Inc.* provides that the letter must contain sufficient information by which to identify the aggrieved group, No. CV 20-1854-JFW (ASx), 2020 WL 11626649, at *4-5 (C.D. Cal. Dec. 16, 2020), but the notice letter Coach Day sent to the LWDA did not satisfy that requirement, which is the reason dismissal is appropriate. Instead, Coach Day merely included language of "current and former employees" and "other employees," without *any* information (let alone "sufficient information") by which to identify those allegedly aggrieved. (Defendants' Motion to Dismiss Ex. F to Platt Decl. at 1-3.) This is legally insufficient.

## X. Plaintiffs did not sufficiently plead a claim under California's Unfair Competition Law because, among other reasons, they have not pleaded economic injury.

Despite Plaintiffs' misreading of the case law, to have standing to bring a claim under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 ("UCL"), a plaintiff *must* establish an economic injury. This state law "requires that a plaintiff have 'lost money or property' to have standing to sue." *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 322, 246 P.3d 877, 884 (2011). Defendants did not "fail to provide the Court with a full cite" to the definition of standing for UCL claims as recited in *Kwikset*. (Opp. at 39.) Instead, Plaintiffs confuse the requirement for Article III standing with the "substantially narrower" requirement for UCL claims. As explained by *Kwikset*, the "requirement that injury be economic renders standing under [the UCL] ***substantially narrower than federal standing*** under article III, section 2 of the United States Constitution, which may be predicated on a broader range of injuries." *Id.* at 324 (emphasis added). Here, Plaintiffs do not sufficiently plead such an economic injury to satisfy the UCL standing requirement.

---

of the alleged violations, so it is inapposite.

Furthermore, Plaintiffs do not even address Defendants' argument that they fail to sufficiently allege that any proffered injury is the result of "actual reliance" on Defendants' conduct.

**XI. Counts 1-7 and 13 are barred by the "ANTI-SLAPP" statute.**

First, contrary to Plaintiffs' argument, "the challenged action [here] arises from protected activity," *i.e.* "conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." Cal. Civ. Proc. Code § 425.16(e)(4); *Sanchez v. Am. Media, Inc.*, No. CV 20-2924-DMG (PVCx), 2020 WL 8816343, at *4 (C.D. Cal. Dec. 29, 2020). Plaintiffs appear to concede that this is true as to all claims aside from its breach of contract claim. (Opp. at 41-42.)

As to the breach of contract claim, Plaintiffs' argue that it does not arise from Defendants' communication/actions related to its response to the racially-charged lip-syncing event. However, such an assertion is belied by their own allegations. As set forth in the case cited by Plaintiffs, when the defendant's alleged actions taken in connection with the protected communication is a "but for" cause of the claim, it falls within the ambit of the anti-SLAPP statute's "arising from" prong. *See Park v. Bd. of Trustees of California State Univ.*, 393 P.3d 905, 909 (Cal. 2017) ("but for the . . . [the defendant's] alleged actions taken in connection with that [protected speech], plaintiffs' present claims would have no basis. This action therefore falls squarely within the ambit of the anti-SLAPP statute's 'arising from' prong."). Plaintiffs here *affirmatively allege* that their breach of contract claim, which stems from Defendant's responses to other students' actions, would *not* have occurred, "**but for** the egregiously wrongful actions of Defendants [in responding to their allegedly racist conduct]." (FAC ¶ 146) (emphasis added).) Plaintiffs go on to allege that "Defendants, through their extremely reckless and grossly negligent conduct, have fostered and maintained a racially toxic environment on campus that has directly and

proximately caused these postings, and many other postings of a similar nature, to be directed at the Softball Team." (*Id.*) Thus, the crux of Plaintiffs' breach of contract claim is that Defendants behavior directly led to a breach of contract. (*Id.* at 148.) Therefore, the breach of contract claim arises from the protected activity and are entitled to anti-SLAPP protection.[12]

Next, Plaintiffs attempt to assert that the Blackface statements, which did *not* name any of the Softball players or identify them as a group, somehow contained personally identifiable information in violation of FERPA. Education records are defined by FERPA as "records, files, documents, and other materials" containing information directly related to a student, which "are maintained by an educational agency or institution or by a person acting for such agency or institution[.]" 20 U.S.C. § 1232(a)(4)(A). Emails and communication that failed to name *any* student certainly are not within the ambit of personally identifiable information under FERPA. *See S.A. v. Tulare Cty. Off. of Educ.*, No. CV F-08-1215 LJO GSA, 2009 WL 3296653, at *5 (E.D. Cal. Oct. 6, 2009) (holding that emails specifically naming students did not even count as personally identifiable information); *see also* 34 C.F.R. § 99.3 (discussing what constitutes "personally identifiable information").

The second-prong of the anti-SLAPP analysis is satisfied because Plaintiffs failed to state claims in Counts 1-7 and 13 of the Amended Complaint.

## XII. Plaintiffs' demand for punitive damages is not adequately pleaded and should be stricken because, among other reasons, Plaintiffs have failed to allege facts that demonstrate malice.

Plaintiffs' contention that "malice for punitive damages can be alleged generally," (Opp. at 45), is not supported by recent case law from this Court. In *Poozhikala v. Medtronic Inc.*, this Court stated: "The better view [of what is required

[12] The same is true as to the claims by the Softball Coaches. All of the claims at issue arise directly out of Defendants' conduct following the racially-charged team event and the University's speech and reactions thereto.

for a request for punitive damages] conforms to the pleading standards set forth in *Twombly and Iqbal*. . . Here, Plaintiffs fail to supply factual support showing Defendant acted with 'oppression, fraud, or malice,' relying instead upon conclusory allegations. Therefore, Plaintiffs' request for punitive damages is dismissed[.]" No. CV 21-8889 PA (SKX), 2022 WL 610276, at *8 (C.D. Cal. Jan. 31, 2022). Just as in *Poozhikala*, Plaintiffs here fail to supply any factual support showing that Defendants acted with "oppression, fraud, or malice," and, instead, rely on insufficient conclusory allegations. (FAC ¶¶ 176, 203, 209, 218, 261, 268.) As such, at a minimum, Plaintiffs' demand for punitive damages should be stricken.

## CONCLUSION

For the reasons set forth herein, and for the reasons set forth in Defendants' opening Memorandum, Defendants respectfully request that the Court dismiss Plaintiffs' Amended Complaint in its entirety under Fed. R. Civ. P. 12(b)(5) and 12(b)(6) on the following grounds: (1) the Amended Complaint has not been validly or timely served; (2) Counts 1-7 and 9-13 fail to state a legally cognizable claim; and (3) Counts 1-7 and 9-13 violate California's anti-SLAPP statute. Alternatively, and in addition, Defendants respectfully request that the Court strike Plaintiff's demand for punitive damages.

Dated: April 29, 2022

Respectfully submitted,

**SAUL EWING ARNSTEIN & LEHR LLP**

By: */s/ Henry A. Platt*
Henry A. Platt

*Attorney for Defendants California Lutheran University, Chris Kimball, Melissa Maxwell-Doherty, Jim McHugh, and Karin Grennan*